Argued and submitted May 31, 2001, affirmed January 9, 2002

## STATE OF OREGON,
*Respondent,*

*v.*

## LESTER RAY JIM,
*Appellant.*

CR 99-089; A107059

37 P3d 241

Daniel M. Carroll, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Brewer, Judge.

LANDAU, P. J.

_____

* Deits, C. J., *vice* Ceniceros, S. J.

## LANDAU, P. J.

Defendant, a member of the Yakima Indian Nation, challenges the authority of the state to prosecute him for driving offenses committed on a public road in Celilo Indian Village, an area of Wasco County that is held in trust by the federal government for three different tribes. Defendant demurred to the charges, arguing that Celilo Indian Village should be regarded as part of the Warm Springs Reservation, an area over which the state lacks criminal jurisdiction. The trial court held that, although Celilo Indian Village is held in trust for several tribes, it is part of no particular reservation and overruled the demurrer. Defendant appeals, and we affirm.

The relevant facts are not in dispute. Defendant resides in Celilo Indian Village, a tract of land that the federal government purchased from a private landowner in 1947 to be held by the federal government

> "in trust for the use of the Yakima Indian Tribes, the Umatilla Indian Tribes, the Confederated Tribes of the Warm Springs Reservation, and other Columbia River Indians affiliated with the aforementioned tribes."

The acquisition was intended to replace nonreservation lands on the south shore of the Columbia River, on which members of certain tribes retained the right to fish "in common" with other tribes and non-Indians and which recently had been inundated after the construction of several dams on the river.

A Wasco County Deputy Sheriff observed defendant swerving on the main road in Celilo Indian Village. The deputy stopped him, administered field sobriety tests, and ran a records check. Ultimately, he arrested defendant for driving under the influence of intoxicants, ORS 813.010, and driving while suspended, ORS 811.182.

Defendant demurred to the charges, arguing that the state lacks criminal jurisdiction over offenses committed in Celilo Indian Village. Defendant reasoned that, under federal law, the criminal jurisdiction of the State of Oregon extends throughout the state, with the sole exception of the

Warm Springs Reservation. He argued that, because Celilo Indian Village is an area held in trust for three tribal confederations, one of which is the Warm Springs Tribes, it should be regarded as part of the Warm Springs Reservation. The state argued that, although Congress indeed has conferred on it criminal jurisdiction over all the state except the Warm Springs Reservation, Celilo Indian Village simply is not part of the Warm Springs Reservation. The state noted that we held precisely that in *State v. Jim*, 81 Or App 177, 725 P2d 365 (1986), *rev den* 302 Or 571 (1987). Defendant acknowledged that, in *Jim*, we commented that, although Celilo Indian Village was held in trust for, among others, the Warm Springs Tribes, it is not a part of the Warm Springs Reservation itself. He insisted, however, that the comment was *dictum* and that the *dictum* was incorrect. The trial court agreed with the state and overruled the demurrer.

On appeal, defendant repeats his contention that Celilo Indian Village should be regarded as part of the Warm Springs Reservation, indeed, part of the reservations of all three of the tribal confederations for whom the federal government holds the property in trust. The state reiterates its contention that, as we held in *Jim*, Celilo Indian Village is held in trust for several tribal confederations, but it is not part of the reservation of any of them.

The criminal jurisdiction of the state, the federal government, and the Indian nations is a complex matter that may depend on the nature of the crime, the location of its commission, and the nationalities of the defendant and any victims. *See generally* Monroe E. Price and Robert N. Clinton, *Law and the American Indian*, 207-21 (2d ed 1983); Felix S. Cohen, *Handbook of Federal Indian Law*, 281-385 (1982). As pertinent to this case, however, the following relatively straightforward principles apply.

States have criminal jurisdiction over crimes committed by Indians in "Indian country" only to the extent that such jurisdiction has been granted by Congress. *See Langly v. Ryder*, 778 F2d 1092, 1096 (5th Cir 1985) ("In order for a state to exercise criminal jurisdiction within Indian country there must be clear and unequivocal grant of that authority.") (citing *Oliphant v. Suquamish Indian Tribe*, 435 US

191, 208 n 17, 98 S Ct 1011, 55 L Ed 2d 209 (1978)). "Indian country" refers to:

> "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of the state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way through the same."

18 USC § 1151.

In 1953, Congress conferred limited criminal jurisdiction on the states in Public Law 280, codified at 18 USC § 1162(a):

> "Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory."

The table that follows lists Oregon and, opposite the name of the state, provides that its criminal jurisdiction extends to "[a]ll Indian country within the [s]tate, except the Warm Springs Reservation." 18 USC § 1162(a). It bears some emphasis that Public Law 280 excepts from the criminal jurisdiction of the state not all reservation land, or even all reservation land that the members of the Warm Springs Tribes are entitled to use; rather, it excepts only the tract of land that comprises the Warm Springs Reservation itself.

The Warm Springs Reservation originally was created by the Treaty of 1855 between the United States and "the confederated tribes and bands of Indians, residing in Middle Oregon." 12 Stat 963. The tribes ceded their claims to most of what is now northern Oregon. In exchange, a tract of

land near what is now the city of Bend was "set apart as a residence for said Indians." *Id.* at 964. This tract of land was to be "held and regarded as an Indian reservation." *Id.* The tract was not given a name in the treaty itself, but it was specifically identified as follows:

> "Commencing in the middle of the channel of the De Chutes River opposite the eastern termination of a range of high lands usually known as the Mutton Mountains; thence westerly to the summit of said range, along the divide to its connection with the Cascade Mountains; thence to the summit of said mountains; thence southerly to Mount Jefferson; thence down the main branch of the De Chutes River; heading in this peak, to its junction with the De Chutes River; and thence down the middle of the channel of said river to the place of beginning."

*Id.*

The tract was surveyed in 1871 by T. B. Handley. 28 Stat 86. The tribes disagreed with Handley's survey, contending that he had placed the northern boundary well south of the agreed line. A second survey, conducted in 1887 by John A. McQuinn, indicated that Handley, in fact, had placed the northern boundary too far south. The area of land between the McQuinn survey line and the Handley survey line became known as "the McQuinn Strip."

In 1894, Congress fixed the boundaries in accordance with the Handley survey and, for the first time, referred to the entire area identified in the Treaty of 1855 as the "Warm Springs Indian Reservation." 28 Stat 86. The tribes, however, continued to protest. After nearly 80 years of controversy, Congress changed the northern boundary of the reservation to include the McQuinn Strip. The law now provides that

> "title to the federal lands, together with all improvements thereon, known as the McQuinn Strip, is declared to be in the United States in trust for the use and benefit of the Confederated Tribes of the Warm Springs Reservation of Oregon, and a part of the Warm Springs Reservation of Oregon."

86 Stat 719. In describing the McQuinn Strip, Congress noted that it added land onto "the northern boundary of the

Warm Springs Indian Reservation as established by the Act of June 6, 1894 (28 Stat 86)." 86 Stat 719. The Warm Springs Reservation, therefore, consists of the area described in the 1894 Act plus the McQuinn Strip. *Id.*

With the foregoing in mind, we turn to the question whether Celilo Indian Village is part of the Warm Springs Reservation. In *Jim*, the defendant, a member of the Yakima Indian Nation, had caught salmon from the Columbia River and sold it in Celilo Indian Village at a time when state law prohibited such a sale. He was convicted of selling fish out of season, and, on appeal, he argued that the state lacked authority to enforce violations of state fishing regulations because the right to sell the fish—even in violation of state law—was secured by treaty with the Yakima tribes. In the course of rejecting that argument, we described Celilo Indian Village and, in a footnote, observed that, although Celilo Indian Village may be a "reservation" in a general sense, "it seems clear that it is not a part of the reservation of any particular tribe." 81 Or App at 180 n 4.

Whether the comment in *Jim* amounted to holding or *dictum*, it clearly was correct, at least with respect to the Warm Springs Reservation. Congress has defined the boundaries of the Warm Springs Reservation by statute, and Celilo Indian Village is not within those boundaries. That ends the matter.

Defendant insists that, because Celilo Indian Village is held by the federal government in trust for, among others, the Warm Springs Tribes, it should be considered part of that reservation. In support of that contention, he cites *United States v. John*, 437 US 634, 98 S Ct 2541, 57 L Ed 2d 489 (1978). Defendant reads the case far too broadly, however.

In *John*, the issue was whether the federal government had exclusive jurisdiction to prosecute the defendant for criminal acts committed in "Indian country" within the meaning of 18 USC § 1151. The tract in dispute had been declared by Congress to be held in trust for the benefit of the Mississippi Choctaw Indians, who were at the time under federal supervision. Congress later expressly declared that the tract was a "reservation." *John,* 437 US at 649. The United States Supreme Court held that

"[t]here is no apparent reason why those lands, which had been purchased in previous years for the aid of those Indians, did not become a 'reservation,' at least for the purposes of federal criminal jurisdiction at that particular time."

*Id.* The Court went on to say that, in any event, the matter was resolved by the express declaration that the tract was a "reservation." *Id.* Therefore, the federal government had exclusive authority to prosecute. *Id.* at 649-50.

At best, *John* stands for the proposition that a tract of land held in trust for a tribe is a reservation. Such a proposition does not avail defendant, however. The question in this case is not whether Celilo Indian Village is a reservation within the meaning of 18 USC § 1151, but whether it is located within the boundaries of a *particular* reservation, namely, the Warm Springs Reservation, as provided in 18 USC § 1162(a).

Moreover, defendant's argument cannot be reconciled with the statutes that define the boundaries of the Warm Springs Reservation and expressly recognize the difference between merely holding a parcel of land for the benefit of a tribe and actually making a parcel part of the tribe's reservation. *See, e.g.,* 86 Stat 719 (declaring the McQuinn Strip to be held in trust for the Confederated Tribes of the Warm Springs and made "a part of the Warm Springs Reservation").

We conclude that the trial court did not err in overruling defendant's demurrer.

Affirmed.