54 P.3d 456

STATE of Idaho, Plaintiff–Respondent,

v.

Ronald A. SIMPSON, Defendant–
Appellant.

State of Idaho, Plaintiff–Respondent,

v.

Jeremiah A. Simpson, Defendant–
Appellant.

State of Idaho, Plaintiff–Respondent,

v.

Jeffrey Jackson, Defendant–Appellant.

Nos. 27008, 27012, 27013.

Court of Appeals of Idaho.

May 28, 2002.

Rehearing Denied July 8, 2002.

Review Denied Sept. 24, 2002.

Law Offices of James W. Grow, Lewiston, for appellants. Todd S. Richardson argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

LANSING, Judge.

Ronald Simpson, Jeremiah Simpson, and Jeffrey Jackson appeal from their judgments of conviction for two counts each of possession of unlawfully taken elk. The defendants argue that the magistrate and district courts misconstrued the Nez Perce Treaty of 1855 in concluding that Jackson was not acting within his rights as a member of the Nez Perce Tribe when he shot the elk. They also argue that the magistrate erred by refusing to instruct the jury on mistake of fact as a defense based on the defendants' belief that the elk were shot on public land where tribal hunting rights apply.

# I.

## BACKGROUND

In April 1998, the defendants were camping in an area of Clearwater County known as Casey Meadows on property owned by Potlatch Corporation. Potlatch had generally permitted the public to use its forest land for recreational activities such as hunting and camping. While there, Jackson shot and killed two elk. Because it occurred out of hunting season, the shooting of the elk was in violation of Idaho hunting laws.

Someone reported the hunting to the Idaho Department of Fish and Game. A Fish and Game officer and a sheriff's deputy who went to the area to investigate found the two elk carcasses in Ronald Simpson's truck. Jackson, who is an enrolled member of the Nez Perce Tribe, told the officers that he had shot the elk, and Jeremiah Simpson admitted that he had assisted in loading the elk into the truck. All three defendants were charged with two counts of possession of an unlawfully taken elk, Idaho Code § 36–502(b). They moved the court to dismiss the charges, arguing that the hunting rights provisions in the Nez Perce Treaty of 1855 ("Nez Perce Treaty") made state game laws inapplicable to Jackson. The magistrate denied this motion, holding that the treaty hunting rights did not apply on private property.

The case was tried before a jury in the magistrate division of the district court. At trial, the defendants asserted that they believed in good faith that Jackson was hunting on public lands, which would have made his acts legal under the Nez Perce Treaty. However, the defendants' request for an instruction on mistake of fact as a defense was denied. The jury found each defendant guilty on both counts. The defendants appealed to the district court, which affirmed. They now appeal to this Court raising two issues. First, they reassert that the killing of the elk was lawful under the terms of the Nez Perce Treaty. The treaty preserved to members of the Nez Perce Tribe the right to hunt on "open and unclaimed land," which the defendants interpret to include the Potlatch property where the elk in question were shot. Second, they contend that even if Jackson's hunting was not on open and unclaimed land, they were entitled to a jury instruction on mistake of fact.

# II.

## DISCUSSION

### A. The Nez Perce Treaty

■ The defendants rely on the Nez Perce Treaty to legalize their actions. The Idaho Supreme Court has succinctly described the origin of that treaty as follows:

From May 22, 1855 through June 11, 1855, a meeting between the Nez Perce and other Indian tribes, including the Yakimas, and representatives of the United States government was held at the Council Grounds in Walla Walla Valley. Governor Isaac I. Stevens, of the Territory of Washington, and General Joel Palmer, of the Territory of Oregon, represented the Federal Government, and Chiefs and various spokesmen of the tribes represented the Indians. The extended negotiations culminated in the Treaty of June 11, 1855, whereby the Indians for monetary and other considerations ceded to the United States a vast territory exceeding 16,000 square miles in area.

*State v. Arthur,* 74 Idaho 251, 255, 261 P.2d 135, 136 (1953). The treaty reserved to tribal members certain rights to hunt, fish, and gather food off of the reservation:

The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places in common with citizens of the Territory, and of erecting temporary buildings for curing, *together with the privilege of hunting,* gathering roots and berries, and pasturing their horses and cattle *upon open and unclaimed land.*

Nez Perce Treaty of 1855, Article III (emphasis added).

The geographic scope of Jackson's tribal hunting rights turns upon the meaning of "open and unclaimed land" as used in the treaty. The defendants argue that it in-

cludes privately owned land that is "open" and undeveloped. They rely upon several principles of Indian treaty interpretation, including the canons that a treaty's terms "must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians," *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 11, 44 L.Ed. 49, 54 (1899); and that any ambiguities are to be resolved in favor of the Indians. *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 269, 112 S.Ct. 683, 693, 116 L.Ed.2d 687, 704 (1992); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211, 52 L.Ed. 340, 346 (1908). The defendants also rely upon statements of Governor Stevens, the United States' chief negotiator, explaining the treaty terms to the tribal chiefs, as recorded in the minutes of the Treaty Council. According to those minutes, Governor Stevens sometimes described the Nez Perce Treaty as allowing the Tribe to hunt on land "not occupied by whites." The defendants contend that, employing the foregoing canons of treaty interpretation and taking into account Governor Stevens' representations, the term "open and unclaimed land" is synonymous with "unoccupied land," so that even land in private ownership is subject to Nez Perce hunting rights unless the land shows sufficient indicia of occupancy to put a reasonable Indian hunter on notice that it is occupied.

We conclude that the treaty interpretation urged by the defendants is foreclosed by decisions of the Idaho Supreme Court. The first is *Arthur,* in which the Court interpreted the same treaty that is now at issue. In that case, a member of the Nez Perce Tribe was charged with killing a deer out of season while hunting on national forest land. The Supreme Court was called upon to determine whether the reserved rights under the Nez Perce Treaty encompassed the right to hunt on land in the Nez Perce National Forest. In addressing that issue, the Court considered the "open and unclaimed land" language of the treaty and opined that the language:

> [w]as intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights

or patent *or otherwise appropriated to private ownership* and was not intended to nor did it exclude lands title to which rested in the federal government, hence the National Forest Reserve upon which the game in question was killed was "open and unclaimed land."

*Id.* at 261, 261 P.2d at 141. Although this statement concerning the status of land in private ownership might be considered dicta in the *Arthur* decision, where the issue presented concerned national forest land, the same cannot be said of the Supreme Court's subsequent decision in *State v. Coffee,* 97 Idaho 905, 556 P.2d 1185 (1976). Coffee, a member of the Kootenai Indian Tribe, shot and killed two deer on privately-owned land. The Court considered the extent to which the Kootenai's aboriginal hunting rights were extinguished or limited by another treaty that was also negotiated by Governor Stevens in 1855 and which, like the Nez Perce Treaty, reserved to the Indians the right to hunt upon "open and unclaimed land." After quoting *Arthur's* pronouncement that open and unclaimed land does not include that which is appropriated to private ownership, the Court held that the defendant, while hunting on private land, was subject to the State game laws. "Land which is privately owned," the Supreme Court said, "is not open and unclaimed." *Id.* at 914, 556 P.2d at 1194.

In the present case, it is undisputed that Jackson killed the elk on private land; therefore, he was not on open and unclaimed land subject to tribal hunting rights. It follows that the magistrate did not err in denying the defendants' motion to dismiss the charges.

### B. Mistake of Fact

■ The defendants alternatively argue that they reasonably believed that the elk were taken on public lands subject to tribal hunting rights. Although Casey Meadows is entirely owned by Potlatch Corporation, the state owns a significant amount of land in the area, some as near as a half-mile from Casey Meadows. Based on evidence of road signs in the area that show the roads are jointly

maintained by Potlatch, the Idaho Department of Lands, and the U.S. Forest Service, the defendants claim to have reasonably believed that the elk were taken on state land.[1] They characterize this as a mistake of fact going to the intent element of the charged crime, i.e., that they did not know that the elk were taken unlawfully. They assert error in the magistrate's refusal to instruct the jury on mistake of fact as a defense.

■ The mistake of fact defense is authorized by I.C. § 18–201, which states, in part:

All persons are capable of committing crimes, except those belonging to the following classes:

1. Persons who committed the act or made the omission charged, under an ignorance or mistake of fact which disproves any criminal intent.

. . . .

Whether a defendant's claimed mistake of fact constitutes a defense turns upon the language of the statute that the defendant is charged with violating and the mental state, if any, that is legislatively required as an element of the offense. *State v. Stiffler,* 117 Idaho 405, 406, 788 P.2d 220, 221 (1990); *State v. Sterrett,* 35 Idaho 580, 582–83, 207 P. 1071, 1072 (1922); *State v. Wimer,* 118 Idaho 732, 735, 800 P.2d 128, 131 (Ct.App.1990).

In *Sterrett,* the defendant was charged with violating a statute that declared it unlawful for any person "to transport any intoxicating liquor or alcohol unless the same was procured and is so possessed and transported under a permit as hereinafter provided. . . ." *Sterrett,* 35 Idaho at 582, 207 P. at 1072. The Supreme Court rejected Sterrett's proffered defense that he was acting in good faith in transporting the liquor because he had been orally deputized by a probate judge, given a search warrant, and instructed by the probate judge to seize the liquor and transport it to a specific location. The Supreme Court held that these facts provided no defense, explaining:

At common law a crime possessed the element of an evil intention together with an unlawful act, but the rule is well established that it is competent for the legislature to prohibit the doing of a particular act and to provide a penalty for the violation of the prohibition. This court held in *State v. Keller,* 8 Ida. 699, 70 Pac. 1051, that: "Wicked or wilful intent to violate the criminal law is not an essential ingredient in every criminal offense. And that is so in statutory offenses when the statute does not make the intent with which an act is done an ingredient of the crime. The rule is that in acts *mala in se* the intent governs, and in acts *mala prohibita,* the intent does not govern, and the only inquiry is, 'Has the law been violated?' "

. . . .

Whether a criminal intent is a necessary element of a statutory offense is a matter of construction, to be determined from the language of the statute in view of its manifest purpose and design, and where such intent is not made an ingredient of the offense, the intention with which the act is done, or the lack of any criminal intent in the premises, is immaterial. It is apparent that by C.S., secs. 2606 and 8087, the legislature has made the intentional transportation of intoxicating liquor, without legal authority, unlawful, and that the good intentions and good faith of the person transporting the liquor is immaterial. In the interest of the public, the burden is placed upon the actor to ascertain at his peril whether his deed is within the prohibition of the statute. Error cannot be predicated upon the action of the court in excluding evidence tending to show the defendant's good intentions and good faith, where a criminal intent is not a necessary element of the offense charged.

*Sterrett,* 35 Idaho at 582–83, 207 P. at 1072 (citations omitted). Following *Sterrett,* in *Wimer,* this Court held that the offense of taking an elk without a valid license, in violation of I.C. § 36–502, did not require proof of criminal intent. *See also State v. Nesbitt,* 79

---

1. The trial court ruled that state land could be subject to tribal hunting rights. The State has chosen not to challenge that ruling in this appeal, and we need not address it. For purposes of our analysis, we will assume that Jackson's elk hunting would have been legal if conducted on undeveloped state land.

Idaho 1, 8, 310 P.2d 787, 792 (1957) (holding that defendant's alleged belief that road was private and not public was not a defense to charge that he committed crime of intentionally obstructing a public road because criminal intent was not an element of the crime).

The misdemeanor statute under which the defendants were prosecuted is I.C. § 36-502(b), which states: "No person shall have in his possession any wildlife or parts thereof protected by the provisions of this title and the taking or killing of which is unlawful." The statute is violated by the act of possession. It does not require that the perpetrator have knowledge that the wildlife was taken unlawfully. As with regard to the statute scrutinized in *Sterrett,* "the burden is placed upon the actor to ascertain at his peril whether his deed is within the prohibition of the statute." *Sterrett,* 35 Idaho at 583, 207 P. at 1072. Therefore, the defendants' claimed mistake of fact does not negate a mental element of the crime and is not a defense. It follows that the magistrate did not err in refusing the defendants' requested jury instruction on mistake of fact.

### III.

### CONCLUSION

The defendants have not shown that the land upon which Jackson shot the elk was "open and unclaimed land" on which Indian hunting rights were reserved by the Nez Perce Treaty, and their claimed mistake about ownership of the land does not present a defense to the misdemeanor for which they were convicted. Therefore, the judgments of conviction for all defendants are affirmed.

Chief Judge PERRY and Judge GUTIERREZ, concur.