Argued and submitted October 4, 2006, affirmed April 4, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

IRVIN C. WATTERS, JR.,
*Defendant-Appellant.*

03M5471; A127144 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

IRVIN C. WATTERS, SR.,
*Defendant-Appellant.*

Wallowa County Circuit Court
03M5472; A127145

156 P3d 145

Ronald D. Schenck argued the cause and filed the brief for appellants.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Wollheim, Judge.

EDMONDS, P. J.

---

* Brewer, C. J., *vice* Linder, J.

## EDMONDS, P. J.

Defendants—father and son—are Native Americans and members of the Nez Perce Tribe. They appeal convictions for game violations arising out of the killing of two elk out of season and on private property.[1] Defendants contend that, pursuant to an 1855 treaty between the Nez Perce and the United States, they are entitled to hunt and take game from open and unclaimed land that was part of their original hunting grounds, which includes the private property where the elk were killed. The trial court disagreed and, following a trial to the court, convicted defendants. On appeal, defendants make three assignments of error. They assert that the trial court erred in: (1) denying their motions to dismiss on the ground that the state has no jurisdiction to try members of the Nez Perce Tribe for game violations on lands ceded to the United States by treaty; (2) denying their demurrers; and (3) determining that the land on which defendants took the elk was not "open and unclaimed" as that phrase is used in the 1855 treaty. For the reasons explained below, we reject each of defendants' assignments of error and affirm.

The essential facts are undisputed. Defendants shot and killed two elk on private land owned by the Boise Cascade Corporation in Wallowa County. At the time, there was no open season for elk under Oregon law, and defendants did not have an Oregon license or tag for elk. Nor did defendants have permission from Boise Cascade to hunt on its property, although the company allows people to use the property for lawful recreational activities, including hunting during open season, without specific permission. A private citizen alerted the state police to the kill, and defendants were subsequently charged with misdemeanor game violations for killing elk during closed season.

Defendants, as noted, are enrolled members of the Nez Perce Tribe. They claim to have taken the elk under the

---

[1] Specifically, defendant Watters Sr. was convicted of taking elk during closed season, ORS 498.002, and defendant Watters Jr. was convicted of aiding in a game violation, ORS 496.695, for helping Watters Sr. take elk during closed season. Watters Sr. was also convicted of offensive littering within 100 yards of a waterway, ORS 164.775, but he does not challenge that conviction on appeal.

hunting rights reserved in the 1855 treaty between the Nez Perce and the United States. In particular, Article III of the treaty provides that the Nez Perce may continue to hunt upon "open and unclaimed land" that was originally part of the lands ceded to the United States in the treaty. The Boise Cascade land where defendants killed the elk is part of those ceded lands. Boise Cascade has owned that property since the mid-1950s.

The Smith Mountain section of the Boise Cascade property has several different uses, similar to Forest Service land. Its primary purpose is timber resource management, so there is a logging road system in the area to provide access to the timber resources. Boise Cascade maintains an "ownership gate" on the road into the Wise Creek area to control access to that area. The land in that area is also leased out for cattle grazing, and drift fences separate the different pastures. Most of the grazing allotments have a cabin associated with the leased land to facilitate herd management by the lessee. Two such cabins are located in the Smith Mountain area, and a total of about 38 cabins are scattered throughout the whole Boise Cascade property for public recreational use. At major points of access, the company also has signs posted that identify the property as owned by Boise Cascade.

The game officer who cited defendants testified that there are two signs with Boise Cascade logos on them near the access gate to the Smith Mountain area. Defendants claimed that they did not see the signs or any improvements other than the access gate, which was open at the time. The kill site was approximately one mile past the gate and 100 yards off the road. Defendants agreed with the game officer that there is a house about a mile and a half before the gate on the road leading into the Boise Cascade land. Based on that evidence, the trial court made the following findings of facts:

"The area of the Elk kill, was on private land, owned by Boise, and controlled by Boise, for Timber production, and other allowed uses such as grazing, and private recreational use. The use by Boise includes in the general area, roads, cabins, fences, cattle guards, [and] signs. Defendant[s] used Boise's road, and went through Boise's gated area [(]even if closed) to access the kill site. There were no

signs, by implication, that the property was US Property. The property is factually NOT open and unclaimed, as it is certainly claimed by Boise."

(Uppercase and underscore in original.)

In an attempt to shed some light on how the Nez Perce would have traditionally perceived the Boise Cascade land in question (*i.e.*, whether they would have viewed it as "claimed" or "unclaimed"), the defense called Alan Marshall, a cultural anthropologist, as an expert witness concerning early Nez Perce history. He testified that the Nez Perce did not have a concept of "title" to land, and that land was held in more of a communal manner. Some areas were treated as "occupied" when, by custom, people would return regularly to a hunting or fishing site. Marshall suggested that early tribal members would view land as "open and unclaimed" if it was not visibly improved, such as an established camping area, a homestead, or a plowed area would be. Although Marshall opined that the existence of a road, gate, or cattle guard would not be the kind of improvement that would put a traditional Nez Perce on notice that an area was "claimed," he conceded that a sign marking ownership might signify "claimed" land under the traditional Nez Perce view of property occupation.

Based on that evidence, and considering cases from other states that have addressed the same issue, the trial court determined that defendants have no reserved treaty right to hunt on private property located outside of the current reservation, but within the boundaries of the 1855 treaty. In other words, the trial court concluded, the Boise Cascade land is not, factually and as a matter of law, "open and unclaimed" within the meaning of the treaty. The trial court further concluded that the state was not required to plead that rights reserved under the treaty of 1855 would not be violated by the criminal prosecution. Instead, defendants were required to assert the treaty as a defense and show their status as persons protected by the treaty, and the state would then be required to present evidence that the treaty does not apply to them (here, that the area of private property was not open and unclaimed).

■ We begin with defendants' first assignment of error. Pretrial, defendants filed a "Demurrer, Motion Challenging Jurisdiction and Motion to Quash and Dismiss." Defendants asserted: "Jurisdiction of Nez Perce Tribal members' hunting rights are solely within the jurisdiction of the Tribal Courts and the Courts of the United States. Therefore, Defendant moves the court to Quash Count 1 of the complaint and dismiss Count 1 with prejudice." In their memorandum in support of the motion, defendants asserted that "the charges fail to assert jurisdiction of these defendants and assert necessary facts—*i.e.*—that the defendants as members of the Nez Perce Tribe took these Elk on lands that were not open, unclaimed and/or unoccupied under the terms of the Treaty of 1855." The trial court initially granted the demurrers, declining to reach the motion to dismiss for lack of jurisdiction. On the state's motion for reconsideration, however, the trial court denied the motions.

On appeal, defendants assign error to the trial court's denial of their motion to dismiss for lack of jurisdiction. They reason that, under the doctrine of reserved rights—which dictates that tribes retain all elements of their original land ownership until they affirmatively act to give them up—Oregon did not receive from the federal government any greater rights to land than the federal government received from Indian nations. Thus, defendants assert, "the States have no jurisdiction over the parties to the Treaties to adjudicate and interpret a treaty as to the meaning and/or intent of the language of the Treaty." The state responds that it is well settled that Oregon courts have jurisdiction over all state criminal offenses occurring in Oregon, other than those committed on the Warm Springs Reservation, even when the offense gives rise to a treaty-based defense.

■ We pause to address a procedural irregularity. As noted, defendants filed a document that purported to include both a demurrer and a motion to dismiss for lack of jurisdiction. But nothing in Oregon's criminal procedure code provides for a separate motion to dismiss on jurisdictional grounds. Instead, that argument must be raised by demurrer or by motion in arrest of judgment. *See State v. Caldwell*, 187 Or App 720, 725 n 3, 69 P3d 830 (2003), *rev den*, 336 Or 376 (2004) ("[H]istorically, the defenses of lack of subject matter

jurisdiction and failure to state a claim have been linked in Oregon law and both have been subject to special provisions regarding how they may be raised *at trial*. *See* ORS 135.640 (objection to the court's jurisdiction or that the facts stated in the indictment do not constitute a crime may be made by demurrer or in arrest of judgment). (Emphasis in original.)

ORS 135.630 sets out the grounds for a demurrer and provides, in part:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"* * * * *

"(3) That the accusatory instrument charges more than one offense not separately stated;

"(4) That the facts stated do not constitute an offense;

"(5) That the accusatory instrument contains matter which, if true, would constitute a legal justification or excuse of the offense charged or other legal bar to the action; or

"(6) That the accusatory instrument is not definite and certain."[2]

ORS 135.640 sets out procedural requirements for objections that are grounds for a demurrer with a pertinent exception:

"When the objections mentioned in ORS 135.630 appear upon the face of the accusatory instrument, they can only be taken by demurrer, except that the objection to the jurisdiction of the court over the subject of the accusatory instrument, or that the facts stated do not constitute an offense, may be taken at the trial, under the plea of not guilty and in arrest of judgment."

In this case, Count 1 of the complaint alleged, with respect to defendant Watters, Sr.,

"The Defendant, Irvin Curtis Watters, on or about July 16, 2003, in Wallowa County, Oregon, did unlawfully and knowingly take a big game mammal, to-wit: elk, during

---

[2] Subsections (1) and (2) of ORS 135.630 apply only to indictments; the accusatory instruments in this case were complaints.

closed season, said act of Defendant being contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon."

Count 1 of the complaint against Watters, Jr. alleged,

"The Defendant, Irvin Curtis Watters, Jr., on or about July 16, 2003, in Wallowa County, Oregon, did unlawfully and knowingly aid in a game violation, to-wit: taking elk during closed season, said act of Defendant being contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon."

We question whether defendants' jurisdictional arguments were properly raised by demurrer in light of the fact that the jurisdictional facts about which they complain are not on the face of the accusatory instruments. Nonetheless, although the state argued against the demurrers, it did not make that particular argument to the trial court, nor does it make that argument on appeal. Because the state has effectively waived any procedural irregularity, we assume without deciding that the jurisdictional claim defendants raise may be raised properly by demurrer. *See State v. Jim*, 178 Or App 553, 555, 37 P3d 241, *rev dismissed*, 335 Or 91 (2002) (defendant challenging trial court jurisdiction based on treaty raised challenge by demurrer). In sum, we treat defendants' motions to dismiss as mislabeled demurrers and proceed to the merits of defendants' jurisdictional challenge.

The United States Supreme Court has noted that "[i]t has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country," including on lands where tribes have reserved hunting and fishing rights.[3] *Organized Village of Kake, et al. v. Egan*, 369 US 60, 75, 82 S Ct 562, 7 L Ed 2d 573 (1962). *See also Nevada v. Hicks*, 533 US 353, 362, 121 S Ct 2304, 150 L Ed 2d 398 (2001) ("It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed * * * off the reservation."); *Mescalero Apache Tribe v. Jones*, 411 US 145, 148-49, 93 S Ct 1267, 36 L Ed 2d 114 (1973) ("Absent express federal

---

[3] Very generally, "Indian country" includes reservation lands, dependent Indian communities, and Indian allotments still under Indian title. *See* 18 USC § 1151.

law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State.").

In *Jim*, 178 Or App at 556, we explained that "[t]he criminal jurisdiction of the state, the federal government, and the Indian nations is a complex matter that may depend on the nature of the crime, the location of its commission, and the nationalities of the defendant and any victims." Nonetheless, this court and the Supreme Court consistently have held that Oregon courts have jurisdiction to try Native Americans for crimes committed off-reservation. *See* ORS 131.215 (generally, "a person is subject to prosecution under the laws of this state for an offense that the person commits * * * if * * * the conduct that is an element of the offense or the result that is an element occurs within this state"); *State v. Smith*, 277 Or 251, 256, 560 P2d 1066 (1977) ("By the terms of [Public Law 280],[4] criminal jurisdiction over Indian reservations was granted to five states, including Oregon, but with the important exception of the Warm Springs Indian Reservation." (Emphasis omitted.)); *North Pacific Ins. Co. v. Switzler*, 143 Or App 223, 229, 924 P2d 839 (1996) ("Under [Public Law 280], we have held that Oregon has no jurisdiction over crimes committed by Native Americans on the Warm Springs Reservation, but does have jurisdiction over such crimes committed off the reservation." (Emphasis omitted.)); *State v. McGill*, 115 Or App 122, 124, 836 P2d 1371 (1992) ("[T]he state does have jurisdiction over crimes committed by Indians off the reservation."). The state had jurisdiction to try defendants for their conduct occurring on private property on ceded lands.

■ In a related vein, defendants argue that state courts have no authority to interpret the meaning and intent of the treaty language; instead, they assert, federal and tribal courts have exclusive authority to determine whether a reserved right has been infringed upon by a state. The state responds that state courts have authority to interpret

---

[4] In 1953, Congress conferred limited criminal jurisdiction on the states in Public Law 280, codified at 18 USC section 1162(a). Under that provision, Oregon's criminal jurisdiction extends to "[a]ll Indian country within the [s]tate, except the Warm Springs Reservation."

whether treaty rights are applicable, and whether those rights preclude state prosecution.

■ Again, we agree with the state. State courts, of course, have authority to interpret federal law, including treaties, in the course of adjudicating criminal cases under state law. *See, e.g., State v. Sanchez-Llamas*, 338 Or 267, 108 P3d 573 (2005), *aff'd sub nom Sanchez-Llamas v. Oregon*, ____ US ____ , 126 S Ct 2669, 165 L Ed 2d 557 (2006) (interpreting Vienna Convention on Consular Relations in course of reviewing criminal case). More directly relevant here, we have addressed whether treaty rights are applicable and thus preclude state jurisdiction to prosecute game offenses (*i.e.*, when an offense gives rise to a treaty defense). In *State v. Jim*, 81 Or App 189, 725 P2d 372 (1986), we reversed a conviction for the unlawful sale of wildlife where a treaty reserved an unqualified right to hunt on the Warm Springs Reservation. Specifically, we determined that the treaty right encompassed the right to sell deer meat on unclaimed lands within ceded territory where the deer was killed on the reservation; thus, the state's power to regulate wildlife must yield to treaty rights under the Supremacy Clause. *Id.* at 192. We concluded that the state had not met its burden to establish that its regulation as applied to treaty hunters was necessary in the interest of conservation, and thus the state lacked jurisdiction to prosecute the defendant for the offense. *Id.* at 194-95. We recognized, however, that, "[a]s a general rule, states have jurisdiction to enforce non-discriminatory laws against Indians off the reservation." *Id.* at 191.

■ Thus, the state is correct that we have (and the trial court had) authority to determine the scope of the treaty right—here, whether defendants retain a right, under the 1855 treaty, to hunt on the Boise Cascade land in question. If—and only if—we were to conclude that the land is "open and unclaimed," and thus subject to treaty hunting rights, would we proceed to inquire whether the state has met its burden to prove that regulating defendants' hunting activities is a necessary conservation measure. *See Antoine v. Washington*, 420 US 194, 207, 95 S Ct 944, 43 L Ed 2d 129 (1975) (stating the proposition). More simply, we have authority to determine whether the state has authority to prosecute game violations in particular off-reservation areas.

*See Jim*, 81 Or App at 196-97. We thus turn to defendants' second assignment of error.

■ Defendants argue on appeal that the trial court incorrectly disallowed their demurrers, because the state did not plead facts necessary to find a member of the Nez Perce Tribe guilty of a game violation. *See* ORS 135.630(4) (providing for demurrer on ground that "the facts stated do not constitute an offense"). Defendants contend that the state failed to plead an offense in the criminal complaints because the complaints did not affirmatively allege that defendants were Nez Perce members, nor did they allege that defendants' reserved rights under the treaty were inapplicable. According to defendants, failing to require the state to plead those additional elements would substantially inhibit Nez Perce members from exercising their retained treaty rights. The state responds that our decision in *State v. Herrera*, 152 Or App 22, 952 P2d 566 (1998), is directly contrary to defendants' position, and is consistent with settled law that a charging instrument need not negate potential defenses.

■ ■ We review the trial court's disallowance of defendants' demurrers for errors of law. *State ex rel Juv. Dept. v. Aragorn*, 189 Or App 65, 72, 73 P3d 939, *rev den*, 336 Or 192 (2003). "Generally, an indictment is sufficient * * * to withstand a demurrer if it tracks the pertinent wording of the statute defining the crime." *State v. Fair*, 326 Or 485, 490, 953 P2d 383 (1998). Defendants do not appear to argue that the complaints were faulty as to establishing the statutory elements of the game offenses. And as the trial court pointed out, their stipulations before the trial court essentially admit all of the statutory elements of those offenses. Moreover, in *Herrera*, we rejected the argument that more is required in this context. In *Herrera*, we upheld a criminal complaint accusing a tribal member of game violations, even though the complaint did not specifically allege that, despite the defendant's status as a tribal member, the violations took place outside an area where treaty hunting is permitted. 152 Or App at 24-25. We reasoned that "the state is not required to negate defenses in the complaint," and the defendant's status as a tribal member constituted a possible defense to the game

offenses. *Id*. at 25. The same reasoning applies to this case.[5] The trial court correctly disallowed defendants' demurrers.

■ Defendants' third and primary argument is that the trial court incorrectly determined that the land on which defendants took the elk was "claimed" within the meaning of the 1855 treaty.[6] Specifically, defendants assert that the act of deeding ceded land to a private entity does not automatically mean that the land is no longer "open and unclaimed" for the purpose of hunting. They argue that, if the character of the land remains the same—that is, essentially undeveloped—it remains "open and unclaimed," because the tribe would have viewed it as such when the treaty was entered into in 1855, as suggested by Professor Marshall's testimony.

In response, the state asserts that the terms of the treaty recognize both that the United States intended to permit future settlement of open lands, and that the tribal members could use settled lands as long as it was with permission of the settlers. The state points to other provisions in the treaty that support that assertion. The state also points to cases from other states, asserting that "tribal members subject to treaties reserving [a right] to hunt on open and unclaimed land are acting outside the scope of the treaty right when hunting and fishing on private lands, and are fully subject to state law." (Internal quotation marks omitted.)

We begin by clarifying the issue before us. Although the parties debate whether private property generally is "open and unclaimed" for purposes of the 1855 treaty, the issue for us is far more narrow. The question before us is whether the parties to the 1855 treaty would have believed land with the characteristics of the land in this case to be

---

[5] Defendants assert without elaboration that *Herrera* was "incorrectly decided and is no longer law in view of the recent Federal cases." We are aware of no support for that assertion and we decline to address it further in the absence of an argument in support of it. *See State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (refusing to address claim absent a "thorough and focused" analysis).

[6] Although defendants assign error to that particular "holding" by the trial court in their brief, it appears that defendants, more precisely, intended to assign error to the trial court's denial of their motions for judgments of acquittal. The state treats the assignment as such, as do we.

open and unclaimed. That is, would the parties to the 1855 treaty have believed that privately owned land that was gated, included cabins, was posted with signs at major points of entrance, had cattle guards, had roads, and had drift fences, was "open and unclaimed"?

The question whether such private lands would be considered "open and unclaimed," and thus subject to reserved hunting rights under the 1855 treaty, is a question of first impression in Oregon. The Supreme Court has explained that "[c]ourts of law are required to interpret treaties as any other contract by giving effect to the intent of the parties as manifested by the terms thereof." *Zschernig v. Miller*, 243 Or 567, 574, 412 P2d 781 (1966), *rev'd on other grounds*, 389 US 429, 88 S Ct 664, 19 L Ed 2d 683 (1968). More specifically, in *Seufert Bros. v. Hoptowit et al*, 193 Or 317, 322-23, 237 P2d 949 (1951), *cert den*, 343 US 926 (1952), the court set out the guidelines for interpreting treaties with Native Americans:

> "It is well established that, in construing a treaty between the United States and Indians, the courts will construe it liberally in favor of the Indians, and in the sense in which its provisions would naturally be understood by the Indians. However, despite this rule of liberal construction, treaties cannot be rewritten or expanded beyond their clear terms, and the obvious, palpable meaning of their words cannot be disregarded, in order to achieve the asserted understanding of the parties.
>
> "* * * * *
>
> "Of course treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. * * * Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. * * * But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."

(Citations and internal quotation marks omitted; ellipses in original.) *See also Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 US 658, 675, 99 S Ct 3055, 61 L Ed 2d 823 (1979) ("A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations. When the signatory nations have not been at war and neither is the vanquished, it is reasonable to assume that they negotiated as equals at arm's length." (Citation omitted.)); *Antoine*, 420 US at 199-200 (treaty must be interpreted by liberally construing any ambiguities in the text in favor of the tribe).

 Treaty interpretation, then, is a form of contract interpretation. When interpreting a contract, we first examine the text and context to determine if the contract provision is ambiguous. *Berry v. Lucas*, 210 Or App 334, 338, 150 P3d 424 (2006). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 313, 129 P3d 773, *rev den*, 341 Or 366 (2006). At that first level, we also consider extrinsic evidence of "the circumstances underlying the formation of the contract." *Id.* at 317. Finally, if the "provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction" to determine the provision's meaning. *Yogman v. Parrott*, 325 Or 358, 364, 937 P2d 1019 (1997). In general, one of those maxims is that ambiguous language in a contract is construed against the drafter. *Berry*, 210 Or App at 339. The analog in construing treaties between the United States and Native Americans is, as the court stated in *Seufert Bros.,* that ambiguities should be construed in favor of the Native Americans, at least when the treaty terms are drafted by the United States. 193 Or at 323.

Following that methodology, we begin with the wording of the treaty itself. Article III of the 1855 treaty provides, in part:

"The exclusive right of taking fish in all the streams where running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, *together with the privilege of hunting*, gathering roots and

berries, and pasturing their horses and cattle *upon open and unclaimed land.*"

12 Stat 958 (emphasis added). The parties disagree about whether the phrase "open and unclaimed land" describes the property at issue here. We agree that the phrase is subject to more than one possible interpretation. We turn to an examination of the words "open" and "unclaimed." At the time of the 1855 treaty, the word "open," as relevant here, meant, "Not fenced or obstructed; as an *open* road. * * * Admitting all persons without restraint; free to all comers." II Noah Webster, *An American Dictionary of the English Language* (1828) (italics in original). To "claim" meant, "To have a right or title to; as, the heir *claims* the estate by descent; he *claims* a promise." I Noah Webster, *An American Dictionary of the English Language* (1828) (italics in original); *see also* I John Bouvier, *Law Dictionary* 278 (1874) (A "claim" is the "possession of a settler upon the wild lands of the government of the United States * * *."). Those definitions suggest that, to those involved in negotiating and signing the 1855 treaty, open and unclaimed lands were those that were not fenced or obstructed (open) and to which no settler had title or possession (unclaimed).

We turn to the context of the portion of Article III quoted above. Article I of the treaty cedes land to the United States. In Article II, a portion of the ceded land is "reserved" as a place for the Nez Perce to live. Under that article, the Nez Perce are given one year from the ratification of the treaty to repair to the reserved land. "In the mean time," the treaty continues,

"it shall be lawful for them to reside upon any ground not in the actual claim and occupation of citizens of the United States, and upon any ground claimed or occupied, if with the permission of the owner or claimant, guarantying, however, the right to all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time * * *."

Finally, Article IV provides for funds to be paid to the Nez Perce for, among other things, "breaking up and fencing farms [and] building houses * * *." Those provisions— that is, the context of Article III—suggest that the parties

anticipated that the United States intended to permit future settlement of open lands, and that tribe members could use settled lands only with the permission of the settlers. The context includes other references to "claimed" land and Article IV makes it clear that the parties were familiar with fencing as an indication of ownership.

The proceedings of the treaty negotiations—which took place over two weeks and are memorialized in minutes—also provide some insight into the circumstances underlying the formation of the treaty. "In 1854 and 1855 Isaac Stevens, who was the first Governor and Superintendent of Indian Affairs for Washington Territory, negotiated several treaties between the United States and the various tribes and bands of Indians who lived in the Territory." *State v. Buchanan*, 138 Wash 2d 186, 198, 978 P2d 1070, 1076 (1999) (footnote omitted). The 1855 treaty at issue in this case was one of those treaties. *See generally* Charles F. Wilkinson, *Indian Tribal Rights and the National Forests: The Case of the Aboriginal Lands of the Nez Perce Tribe*, 34 Idaho L Rev 435, 436-41 (1998) (explaining history of negotiations). As Professor Wilkinson explained,

> "The negotiators for the Nez Perce, and for the other tribes as well, had a complete understanding of the situation. The white people wanted their land, and had the population and technology to take it. The tribes, on the other hand, had considerable leverage: in time they would lose a military campaign, but they could exact great costs in terms of human life and monetary expenditures to fight a war on the fragile, far edge of American territory.
>
> "The calculus was about power, and the tribes could make the calculations as well as the white people."

*Id.* at 438. Both sides knew that the land at issue belonged to the Native Americans, but "[g]iven the military superiority of the United States, it was not a negotiation among equals * * * but it was most definitely a negotiation." *Id.* at 439.

The minutes of the proceedings provide additional clues to the parties' view of the nature of the land at issue. Over the course of the proceedings, Governor Stevens made it clear that the purpose of the treaty was to give the tribes a place—the reservation—where they could be protected from

"bad" white men, a place on which no white men could pass without the permission of the tribes. "[A]lthough we may live near together," he asserted,

> "there should be a line of distinction drawn so that the Indians may know where his land is and the white man where his land is; you are all able to judge for yourselves by the constant difficulties that are occurring here among you, between the whites and the Indians."[7]

In response to the tribes' reluctance to abandon their lands, Governor Stevens explained, "You will be allowed to pasture your animals on land not claimed or occupied by settlers * * * and to kill game on land not occupied by the whites; all this outside the Reservation." *Confederated Tribes of the Umatilla Indian Reservation v. Maison*, 262 F Supp 871, 873 (D Or 1966). (Quoting minutes.) Later in the negotiations, Governor Stevens said to Chief Looking Glass, "Looking Glass knows that * * * he can kill game * * * when he pleases * * * on any of the lands not occupied by settlers." *Id.* Finally, like the text of the treaty itself, the negotiations referred to the manner in which the Native American farms on the reservation would be fenced. General Palmer, who with Governor Stevens negotiated on behalf of the United States, explained, "The President will have this reservation surveyed and marked off, so that every man that has a piece of land will know which is his."

In light of the wording of the treaty, the context of the phrase at issue, and the circumstances surrounding the formation of the treaty, we conclude that the parties would not have considered the property where defendants killed the elk in this case to be "open and unclaimed." The land was indisputably claimed by Boise Cascade; that is, Boise Cascade asserted title to the land. And it was occupied—a term used in the negotiations—by Boise Cascade. In short, the site where the elk were downed was not "unclaimed" as that term is used in the 1855 treaty. Nor was the land "open."

---

[7] Quotations from and references to the minutes are to the United States Department of the Interior, Bureau of Indian Affairs, *Certified Copy of the Original Minutes of the Official Proceedings at the Council in Walla Walla Valley, Which Culminated in the Stevens Treaty of 1855* (Oregon, Bureau of Indian Affairs, 1953). The minutes are available at http://www.lib.uidaho.edu/mcbeth/governmentdoc/1855council.htm (last visited Mar 29, 2007).

Rather than being "[n]ot fenced or obstructed," the land was gated, included cabins, was posted with signs at major points of entrance, had cattle guards, had roads, and had drift fences. In short, the area where defendants killed the elk was not "open and unclaimed"; accordingly, the 1855 treaty between the United States and the Nez Perce did not permit defendants' conduct. Because we reach our conclusion based on the wording of the treaty, the context of that wording, and the circumstances surrounding the treaty's formation, we need not employ the maxim that ambiguities are to be resolved in favor of the tribe.

A trio of decisions from Idaho supports our conclusion regarding the meaning of the phrase "open and unclaimed" in the 1855 treaty. Over half a century ago, in *State v. Arthur*, 74 Idaho 251, 261 P2d 135 (1953), *cert den*, 347 US 937 (1954), the Idaho Supreme Court addressed that language in a case involving a Nez Perce member who was prosecuted for killing a deer out of season. The issue on appeal was whether

> "the defendant, as a member of the Nez Perce tribe, was entitled to hunt wild game on lands ceded by the Nez Perce tribe to the United States by the Treaty of 1855, which lands are now part of the Nez Perce National Forest, during the closed season in disregard of the statutory laws of Idaho."

*Id.* at 255, 261 P2d at 136.

After examining the minutes of the proceedings at the Council of Walla Walla Valley, the *Arthur* court concluded:

> "It will at once become apparent that the meaning of 'open and unclaimed land', as employed in the treaty, becomes more meaningful. It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent *or otherwise appropriated to private ownership* and was not intended to nor did it exclude lands title to which rested in the federal government, hence the National Forest Reserve upon which the game in question was killed was 'open and unclaimed land.' "

*Id.* at 261, 261 P2d at 141 (emphasis added). Because— unlike in this case—the offense took place in a National

Forest, the *Arthur* court ultimately upheld the trial court's dismissal of the criminal prosecution.

The Idaho Supreme Court next addressed the issue in *State v. Coffee*, 97 Idaho 905, 556 P2d 1185 (1976), in which the court interpreted the "open and unclaimed" wording in the 1855 treaty with the Kootenai Tribe, another "Stevens treaty." In *Coffee*, the defendant—a member of the Kootenai Indian Tribe—was convicted of killing a deer out of season and with an artificial light. *Id.* at 906, 556 P2d at 1186. Unlike in *Arthur*, the offense took place on private land. The court, based on its analysis in *Arthur*, held, "Land which is privately owned is not open and unclaimed." *Id.* at 914, 556 P2d at 1194. The court affirmed the defendant's convictions.

Most recently, in *State v. Simpson*, 137 Idaho 813, 54 P3d 456 (2002), *cert den*, 538 US 911 (2003), members of the Nez Perce Tribe were charged with possessing an unlawfully taken elk after killing two elk during closed season on private land owned by a timber company that, like Boise Cascade here, allowed recreational activities on the land. The defendants argued that the "open and unclaimed land" language in the treaty includes privately owned land that is "open" and undeveloped. *Id.* at 814-15, 54 P3d at 457-58. The defendants relied on statements made by Governor Stevens, when explaining the treaty terms to the chiefs. Specifically, as noted above, Stevens described the treaty as allowing the tribe to hunt on land "not occupied by whites." *Id.* at 815, 54 P3d at 458. Thus, according to the defendants, the land must show "sufficient indicia of occupancy to put a reasonable Indian hunter on notice that it is occupied." *Id.* The Idaho Court of Appeals concluded that the former decisions of that court foreclosed the defendants' interpretation, pointing to *Arthur* and *Coffee*. *Simpson* is directly on point and is consistent with our conclusion.

The Montana Supreme Court also has adopted the reasoning of *Arthur*, citing both *Arthur* and *Coffee* when stating that "[l]and owned or occupied by private parties is in no way open or unclaimed within the contemplation of the [Treaty of Hellgate]."[8] *State v. Stasso*, 172 Mont 242, 247-48,

---

[8] Although the language that the Montana court construed was identical to that in the Nez Perce treaty, that statement is *dictum* because the question before

563 P2d 562 (1977); *see also State v. Chambers*, 81 Wash 2d 929, 506 P2d 311, *cert den*, 414 US 1023 (1973) (under the Yakima Treaty of 1855—another Stevens treaty—"open and unclaimed lands" does not include "land * * * in private ownership [that includes] outward indications of such ownership observable to a reasonable man thus[ ] preventing entrapment of an unwary Indian hunter" (internal quotation marks omitted)).

In short, all courts that have addressed the "open and unclaimed" wording in the context of offenses committed on private land have concluded that such land is not "open and unclaimed" within the meaning of the various treaties negotiated by Governor Stevens. Our holding—although consistent with those of other courts—is considerably more narrow. We hold that privately owned land that shows signs of habitation (such as cabins), that includes signs announcing its ownership, and that has other indicia of ownership (such as cattle guards and gated roads) is not open and unclaimed. Under that construction, defendants were acting outside the scope of the treaty right when hunting on the Boise Cascade land and are fully subject to state game laws. We need not decide in this case whether private property generally is or is not "open and unclaimed." But, at least when there are obvious indications of private ownership—as there were here—the land is not open and unclaimed.

◾ Finally, as previously noted in the jurisdiction discussion, it is only when a state attempts to regulate hunting or fishing rights that have been reserved under a treaty that the state must demonstrate that the regulation is a reasonable and necessary conservation measure. *Antoine*, 420 US at 207. That is not an inquiry, then, that we are required to make here. Indeed, the Court in *Antoine* explicitly stated that the case did not involve a claim of right to hunt on fenced private property, and that "[a] claim of entitlement to hunt on fenced or posted private land without prior permission of the owner would raise serious questions[.]" *Id*. at 207 n 11.

Affirmed.

the court was whether National Forest Service lands are "open and unclaimed lands" under the treaty.