Argued October 29, reversed with directions November 14, petition
for rehearing denied December 5, 1951

SEUFERT BROS. COMPANY *v.* HOPTOWIT ET AL.

237 P. 2d 949

*Sam Van Vactor* argued the cause for appellant. On the brief were Brown & Van Vactor, of The Dalles.

*Kenneth R. L. Simmons,* of Billings, Montana, argued the cause for respondents. With him on the brief was Maurice W. Seitz, of Portland.

George Neuner, Attorney General, and Cecil H. Quesseth, Assistant Attorney General, both of Salem, filed a brief as amicus curiae, urging reversal.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and TOOZE, Justices.

## TOOZE, J.

This is a suit for an injunction, brought by Seufert Bros. Company, a corporation, as plaintiff, against Ray Hoptowit, as defendant, to restrain repeated trespasses, and involves certain rights claimed by defendant, as a Yakima Indian, under the provisions of the treaty between the United States and the Yakima (Yakama) tribe of Indians, made June 9, 1855. The suit was dismissed, and plaintiff appeals.

Plaintiff is the owner in fee simple of certain lands bordering on the Columbia river, in Oregon. These lands commence about three miles easterly from The Dalles, in Wasco county, and extend easterly for a considerable distance. At various points along the river where plaintiff has acquired this land there are situated fishing holes or fishing places where, during the fishing seasons, it has been the custom for the public to gather and fish. A great majority of these fishermen are Indians. Most of these fishing places

are old and accustomed fishing stations of the Yakima tribe of Indians.

Plaintiff is a fish canner and processor and, by virtue of its ownership of the land adjacent to these fishing places, has, for a number of years, enjoyed an advantage in the purchase of fish over other competitive buyers for the obvious reason that, because of its ownership of the lands, it had easy—and it might be said, prior—access to the fishermen along the river; whereas other fish buyers had to either use the places of public access or wait until the Indians had transported their fish to the public road. The plaintiff has heretofore successfully maintained its right to prevent its property being overrun and in the circuit court of Wasco county in a prior case obtained injunctive relief.

Defendant Ray Hoptowit is a Yakima Indian and engaged in business as a commercial fish buyer, competing with plaintiff in the purchase of fish. He purchases not only from Indian fishermen, but also from white fishermen. Claiming special rights as an Indian under the provisions of the Yakima treaty, the defendant, despite the injunction mentioned, has commenced to go upon and across plaintiff's lands without permission to conduct his fish buying operations. He drove trucks over plaintiff's land and at times set up scales thereon, using plaintiff's land at will in pursuit of his occupation. He claims that, as a member of the Yakima tribe, in addition to the reservation in the treaty of the right to fish and the right of ingress and egress for that purpose, the treaty also impliedly gives him a right to use plaintiff's land for the purpose of carrying on his business as a commercial fish buyer.

Digressing for the moment, it should be noted that, from time immemorial, these fishing places in the

Columbia river have annually produced untold numbers of salmon. These salmon are taken while in the course of their travel from the Pacific ocean upriver to their spawning grounds. It also should be noted that salmon have always been the principal item in the diet of the Yakima Indian.

■ We are not here concerned with the right of defendant to go upon and across plaintiff's lands for the purpose of fishing at all usual and accustomed places where the Yakima tribe of Indians was wont to fish, for that right is firmly established. *U. S. v. Winans,* 198 US 371, 49 L ed 1089, 25 S Ct 662. Neither are we concerned with the right of the Indian to sell or trade the fish which he may take from these usual and accustomed places. Before the treaty was adopted, he did sell and trade fish which he caught, and his right to sell and trade fish thereafter has not been questioned, nor is it questioned here.

The sole question for determination in this suit is whether the treaty in question should be so construed as to vest in a member of the Yakima tribe the right to go upon and across plaintiff's lands for the sole purpose of purchasing fish as a commercial fish buyer. Defendant is not a fisherman himself, and, as heretofore noted, he buys fish not only from Indian fishermen, but also from the whites.

To decide the question requires an interpretation of Article 3 of the treaty of June 9, 1855, the material portion of which reads as follows:

"The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, *as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of*

*erecting temporary buildings for curing them* * * *.'' (Italics ours.)

■ Under these provisions the Indians reserved the absolute and exclusive right to take fish in all the streams, where running through or bordering upon the reservation. They also reserved the absolute right to take fish at all their usual and accustomed places in streams outside the reservation and of erecting temporary buildings for curing them. An exercise of these latter rights necessarily demanded that a right of ingress and egress be afforded them over lands adjacent to such fishing places; it was a right logically incidental to those rights expressly reserved; it was a right in the adjoining land, and a continuing right. *U. S. v. Winans,* supra. Though the right reserved was to take fish at these places ''in common with citizens of the Territory,'' nevertheless, the Indians enjoyed a special privilege over the citizens of the territory, in that they ''were secured in its enjoyment by a special provision of means for its exercise.'' *U. S. v. Winans,* supra.

■ It is well established that, in construing a treaty between the United States and Indians, the courts will construe it liberally in favor of the Indians, and in the sense in which its provisions would naturally be understood by the Indians. However, despite this rule of liberal construction, treaties cannot be rewritten or expanded beyond their clear terms, and the obvious, palpable meaning of their words cannot be disregarded, in order to achieve the asserted understanding of the parties. *Shoshone Indians v. U. S.,* 324 US 335, 353, 65 S Ct 690, 89 L ed 985; *Choctaw Nation v. U. S.,* 318 US 423, 432, 63 S Ct 672, 87 L ed 877; *Tulee v. State of Washington,* 315 US 681, 62 S Ct 862, 86 L ed 1115; *Seufert Bros. Co. v. U. S.,* 249 US

194, 39 S Ct 203, 63 L ed 555; *U. S. v. Winans*, supra; 42 CJS, Indians, 684, § 25 b.

■ As was said in *Choctaw Nation v. U. S.*, supra, at page 431:

"Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. * * * Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.' * * * But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."

■ Though a Yakima Indian has a right to fish in the "usual and accustomed places," in common with the public, and may not be charged a license fee by the state for an exercise of the privilege, yet this right is not wholly unrestricted and free from all state regulation. The state has the power "to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish." *Tulee v. State of Washington*, supra.

■ It will be noted that the reservation in the treaty refers to the "taking of fish" at all usual and accustomed places. What is meant by "taking fish"? The first part of the reservation indicates an answer to this question. It is there provided that the Indians shall have "the exclusive right of taking fish in *all the streams*," etc. (Italics ours.) One takes fish in a

stream by some method of fishing, not by purchase. In 36 CJS, Fish, 829, § 1, "fishing" is defined as follows:

> "To be employed *in taking fish* as by angling or drawing a net; a pursuit consisting, not of a single act, but of many acts, according to the nature of the fishing. It is not the isolated act alone either of surrounding the fish by the net, or of *taking them out of the water* and obtaining manual custody of them; it is a continuous process beginning from the time when the preliminary preparations are being made for *the taking of the fish* and extending down to the moment when they are finally reduced to actual and certain possession." (Italics ours.)

See also *Johnson v. Hoy*, 151 Or 196, 47 P2d 252.

In the several decisions of the United States Supreme Court construing this same Yakima treaty provision, it appears that that court has treated the words "taking fish" as synonymous with "fishing," for it uses the terms indiscriminately. *Tulee v. State of Washington*, supra; *Seufert Bros. Co. v. U. S.*, supra; *U. S. v. Winans*, supra.

In the negotiations between the Indians and the United States commissioners leading up to the signing of the treaty, there was no mention of anything other than "fishing" or the "right to fish." A transcript of those proceedings was admitted in evidence in this case. An examination thereof discloses but comparatively few references to fish or fishing, though the negotiations commenced on Monday, May 28, 1855, and continued daily, except Sunday, until the treaty was signed on June 9. The references to "fish" and "fishing" are as follows:

> "June 2nd. Saturday.
>
> "Gen'l Palmer Said. * * * they say this land was not made for you alone, the air that we breathe,

the water that we drink, was made for all. The fish that come up the rivers, and the beasts that roam through the forests and the plains, and the fowls of the air, were alike made for the white man and the red man.

"June 4th * * *

"Gov. Stevens said: * * * There is plenty of Salmon on these Reservations.

"June 5th, Tuesday

"Gov. Stevens said: * * * This is a large reservation. The best fisheries on the Snake River are on it; there are the fisheries on the Grande Ronde river. There are fisheries on the Os-ker-wa-wee, and the other streams. There are cumash grounds here at this place (pointing to the large cumash grounds of the Nes Perses). We feel if we put you on this Reservation our agent can visit you all and take care of you all.

"* * * * *

"You will be allowed to pasture your animals on land not claimed or occupied by settlers, white men. You will be allowed to go on the roads, to take your things to market, your horses and cattle. *You will be allowed to go to the usual fishing places and fish in common with the whites,* and to get roots and berries and to kill game on land not occupied by the whites; all this outside the Reservation.

"* * * They take Salmon and catch whale and make oil.

"* * * * *

"The Young Chief said: * * * The Salmon comes up the stream—that is all.

"Gen. Palmer Said: * * * *You will be allowed to go and catch fish* and dig roots the same as the whites * * *.

"Pee-Pee-Mox-Mox said * * * I said to Gen. Palmer that I desired permission to get fish there while I lived * * *.

"Gen. Palmer said: That we have agreed that Pee-Pee-Mox-Mox shall have the privilege of build-

ing a house at the mouth of the Yakima and catching fish for five years.

"Saturday, June 9th

"* * * Gov. Stevens said * * * They have their reservation and fishing stations which they well know and which I understand is satisfactory.

"* * * You will not be called according to the paper to move on the Reservation for two or three years; then is secured to you *your right to fish* * * *.

"Gov. Stevens. * * * that he can catch fish at any of the fishing stations * * *." (All italics ours.)

■ It is clear from the foregoing that the parties had in mind a right to fish, no more, no less. This right was secured to the Indians by express reservation in the treaty. No suggestion was made of a right to purchase and sell fish commercially. There is a vast difference between "fishing" and "purchasing fish." To write into this treaty by implication a provision such as defendant contends for would, in effect, amount to judicial legislation; it would require a rewriting of the provisions in question that would expand the same beyond their clear terms. The language of the treaty is clear and understandable. The chief concern of the Indian was that he not lose his right to fish at his usual and accustomed places off the reservation. This right was secured to him, and with it every other incidental right necessary to its enjoyment, though such incidental rights be implied. The implied rights are based directly upon and grow out of the express right reserved. No right may be implied that does not have as its basis some express provision in the treaty itself. The rule is well stated in *Byers v. We-Wa-Ne,* 86 Or 617, 634, 169 P 121, as follows:

"Under any rule of construction, if it is proposed to base on the treaty such a right as that contended

for by the government, there must be found in the treaty something from which the right can be implied. The treaty may be read in the light of the circumstances under which it was negotiated and ratified. Consideration may be given to the purposes in view and to the situation of the parties, but unless the implication of these water rights is found in the treaty when read in the light of these purposes and circumstances, the rights contended for must be held to be nonexistent.''

■ There is nothing in this treaty upon which the right of access to plaintiff's lands for the purpose of carrying on the business of a commercial fish buyer may be based. The right to "take fish in the streams," that is, "to fish," cannot form the basis for such an implied right of access, because the right of fishing does not embrace the right to purchase and sell commercially.

We have given consideration to the several decisions cited by defendant, and we have given particular attention to the so-called water right cases growing out of Indian treaties; however, we do not find anything therein which, in our opinion, would justify a conclusion such as defendant contends for in the instant case. *U. S. v. Powers,* 305 US 527, 59 S Ct 344, 83 L ed 330; *Alaska Pacific Fisheries v. U. S.,* 248 US 78, 39 S Ct 40, 63 L ed 138; *Winters v. U. S.,* 207 US 564, 28 S Ct 207, 52 L ed 340; *U. S. v. Hibner,* 27 F2d 909; *U. S. v. Parkins,* 18 F2d 642; *Skeem v. U. S.,* 273 F 93; *Conrad Inv. Co. v. U. S.,* 161 F 829.

We hold that the defendant, as a commercial fish buyer, though a Yakima Indian, does not have any right of ingress or egress upon, over, or across plaintiff's lands, without plaintiff's permission, and that his acts in going upon and across such lands to purchase fish

for commercial purposes constitute unlawful trespasses.

In the trial court, as well as here, defendant urged the contention that the Oregon courts lacked jurisdiction to adjudicate the issues in this case, because it is claimed the United States is an indispensable party to this suit.

However, it is unnecessary for us to discuss this question. Upon the oral argument defendant's counsel frankly conceded that, should this court construe the treaty provision in question contrary to defendant's contention, no jurisdictional question would be involved. We have decided the issue against defendant.

■ Defendant admits repeated trespasses upon plaintiff's lands, and that he intends to continue such acts unless restrained. Equity should and will intervene to prevent a continuance thereof. *Bennett v. City of Salem*, 192 Or 531, 235 P2d 772, 779.

■ The decree is reversed and this cause remanded with directions to enter a decree in favor of plaintiff in accordance with the prayer of its complaint.

Neither party to recover costs herein.