Argued and submitted October 27, 2020, reversed and remanded June 30, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILSON BEGAY,
*Defendant-Appellant.*

Wasco County Circuit Court
17CR38009; A169668

495 P3d 732

Defendant—who is a member of the Confederated Tribes and Bands of the Yakama Nation—appeals a judgment of conviction for unlawfully taking a deer, ORS 498.002, on a parcel of privately owned land. On appeal, he challenges the trial court's pretrial ruling prohibiting him from raising and putting on evidence regarding his right to hunt on "open and unclaimed land" as provided in Article III of the Yakama Treaty of 1855. The state contends that defendant's defense is unavailable, because the parcel on which defendant took the deer was not "open and unclaimed" within the meaning of the Treaty. *Held*: The Court of Appeals construed the meaning of "open and unclaimed" as that phrase is used in the 1855 Yakama Treaty and concluded that there was sufficient evidence in the record to support defendant's treaty defense that the parcel where he killed the deer would have been considered "open and unclaimed land" within the meaning of the Treaty.

Reversed and remanded.

Janet L. Stauffer, Judge.

John Evans, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Reversed and remanded.

**TOOKEY, J.**

Defendant—who is a member of the Confederated Tribes and Bands of the Yakama Nation—killed a deer on a parcel of privately owned property, was convicted of unlawfully taking a game animal, ORS 498.002, and now appeals that judgment. His appeal requires us to consider the provisions of the Yakama Treaty of 1855 (the Treaty).

Before trial, defendant gave notice that he would assert as a defense his right to hunt on "open and unclaimed land" as provided in Article III of the Treaty. The state then moved *in limine* for an order prohibiting defendant from offering at trial any evidence, arguments, or jury instructions regarding his treaty defense. The trial court granted the state's motion, determining that the provisions of the Treaty—*i.e.*, defendant's right to hunt on "open and unclaimed land"—did not apply to the particular parcel where defendant killed the deer (the parcel).

On appeal, in his first and second assignments of errors, defendant challenges the trial court's pretrial ruling that prohibited him from raising his treaty defense and putting on evidence regarding that defense. In his third and fourth assignments of error, defendant challenges the trial court's refusal to give two jury instructions regarding the treaty defense. In his fifth assignment of error, defendant contends that the trial court erred in not granting his motion for judgment of acquittal. In his sixth and seventh assignments of error, defendant asserts that the trial court plainly erred in failing to *sua sponte* strike vouching testimony by a witness.

As explained below, we conclude that the trial court erred when it prohibited defendant from raising his treaty defense and from presenting evidence on that defense. Defendant should have been allowed to present his treaty defense at trial and to offer evidence of it. On that basis, we reverse and remand for a new trial. As to defendant's other assignments of error, the trial court did not err in refusing to give the requested jury instructions, insofar as they pertained to a defense that had not been tried (as a result of the court's pretrial ruling), and we decline to opine on the specific wording of the instructions that were offered under

present circumstances. Similarly, as to the motion for judgment of acquittal, the trial court did not err in denying the motion, which was premised on the excluded treaty defense, and we express no opinion as to the merits of such a motion on a different record. Finally, we need not address the sixth and seventh assignments of error, as neither claim of error was preserved, making it likely that a different record may develop if the case is retried.

"We review the record to determine whether defendant presented any evidence to support the defenses he sought to assert and evaluate that evidence in the light most favorable to defendant." *State v. Shields*, 289 Or App 44, 46, 407 P3d 940, *rev den*, 362 Or 794 (2018) (citation and internal quotation marks omitted). "The trial court may withhold an affirmative defense to a criminal charge from the jury only if there is no evidence in the record to support one or more elements of the defense." *Id.* at 47. Because defendant's assignments pertain to a pretrial ruling on the state's motion *in limine*, "we recount the pertinent evidence in the record as of the time that the court made those rulings." *State v. Dart*, 312 Or App 288, 289-90, 491 P3d 813 (2021).

In accordance with that standard, we begin by recounting the relevant facts in the record. After that, we briefly explain the applicable canons of Indian treaty interpretation, after which we examine the Treaty's text and context, the circumstances of its negotiation, and the Yakamas' cultural understanding of property occupancy in order to interpret the meaning of "open and unclaimed land" as used in the Treaty. Finally, with that interpretation in mind, we turn to examining whether the evidence in the record supports defendant's contention that the parcel was "open and unclaimed land," and thus, that he should have been allowed to raise his treaty defense at trial.

## I. FACTUAL BACKGROUND

Defendant is an enrolled member of the Yakama Nation and has been a lifelong resident of Celilo Village, an unincorporated Native American community on the Columbia River in northeastern Wasco County. Defendant has been a fisherman and a hunter since he was eight or nine years old. In April 2017, defendant was tasked with

gathering salmon and deer for the Yakamas' seasonal First Foods Feast. Pursuant to that task, defendant killed and took a deer on a parcel of land located in Wasco County, southeast of the Dalles—an area in which the Yakama had traditionally hunted.

Shortly thereafter, Sergeant Vanderwerf, a supervisor for the Oregon State Police Fish and Wildlife division, began investigating defendant's taking of the deer, and he determined that the parcel was privately owned land. The landowner showed Vanderwerf the specific "kill site" within the parcel where defendant killed the deer. There, Vanderwerf found "evidence of the [deer's] blood and stuff."

As a result of Vanderwerf's investigation, defendant was charged with unlawfully taking a game animal, a violation of ORS 498.002.[1] Before trial, defendant filed a notice of his intent to rely on a defense that, as a member of the Yakama Nation, he had a right to hunt on "open and unclaimed land," as provided in Article III of the Yakama Treaty of 1855. In response, the state filed a motion *in limine*, asking the trial court "to prohibit defendant from offering evidence, arguments, and jury instructions at trial" relating to "the Treaty," "any rights under that Treaty," and "defendant's status as an enrolled member of the Yakama Tribe."

At a hearing on the state's motion, defendant testified that he "didn't open any fences or cross a fence" while hunting; that "There were no signs where I was hunting"; and that "If I see a sign that says no trespassing, then I don't go there." Defendant also testified that where he sees "signs of ownership," he will "find the owner and ask" before he hunts that area, explaining that "That's how *** we've always done things, work with people, talk with people."

---

[1] ORS 498.002 provides:

"(1) Wildlife is the property of the state. No person shall angle for, take, hunt, trap or possess, or assist another in angling for, taking, hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto.

"(2) No person shall angle for, take, hunt or trap, or assist another in angling for, taking, hunting or trapping any wildlife while intentionally violating ORS 164.245 to 164.270 or 498.120."

Johnson Jay Meninick, the Cultural Resource Program Manager for the Yakama Nation, provided additional testimony regarding the Yakamas' historical hunting grounds: "[O]ur tracks go clear into Burns, Oregon, into Canada, British Columbia. And we traveled all over, and we hunted buffalo up into Montana and Wyoming, the Teton Mountains. So our hunting area is broad." Meninick specified that the Yakama had "roamed the country [in] all different areas, both sides of the Columbia River, up in the high country, low country," including "the upland area of Wasco County and *** in the fields out in that region."

Also at that hearing, Vanderwerf testified about the parcel's location and physical characteristics: The privately owned parcel was located beside a county road in "a desolate farming area" of Wasco County. From "a topography standpoint," the parcel was "a downhill slope" with a "[f]airly decent grade." Vanderwerf testified that the specific "kill site" was located within the parcel, "in the neighborhood of 30 yards" downslope from the county road. Vanderwerf noted that "[t]here are no fences" on or surrounding the parcel, though there are "fences relatively nearby"—one "across the road from the [kill site]," and another "several hundred feet" further downslope from the kill site. Vanderwerf further testified that "[t]here were no signs" near the parcel indicating it was private property; "there were no buildings" on the parcel, though he saw "a silo or something" in "the far, far distance"; "there were no vehicles" parked in the parcel; and the parcel "wasn't planted," and it was "not cultivated." According to Vanderwerf's testimony, the parcel had a grass "stubble" and sagebrush on it, and it was "just an open field."

After the hearing, the trial court granted the state's motion *in limine*, and its order explained, in its entirety, that

"Defendant's proposed special jury instructions will not be submitted to the jury. The provision of the 1855 Treaty does not apply to this privately owned land, and the proposed instructions are not accurate statements of the law."

Consequently, defendant's case was presented to a jury without any evidence, arguments, or jury instructions regarding his treaty defense, and defendant was ultimately convicted for one count of unlawfully taking wildlife, ORS 498.002.

On appeal, defendant challenges his conviction, contending that "the trial court erred when it prohibited him from asserting a treaty defense," that "The Yakama Treaty safeguards the right of the Yakama Nation to hunt on 'open and unclaimed land,'" and that "the Yakama Nation would have understood 'open and unclaimed land' to refer to land that bore no visible indicia of ownership—that is, land that had no fences, cultivated fields, buildings, signs, or other such landmarks." In response, the state contends that "the parties to the 1855 treaty would not have considered the parcel to [be] 'open and unclaimed land,' when the parcel had indications of private ownership"—namely,

> (1) "The [parcel] had been in private ownership by [the land-owner's] family since the 1880s"; (2) "The land immediately surrounding the parcel was cultivated"; (3) "A county road ran through the property"; (4) "The land across the road from the parcel was fenced, as was land on the downhill side of [the] parcel"; and (5) "There was a farm structure within view of the parcel."[2]

As the parties' briefing makes clear, the dispute in this case centers on whether the parcel where defendant killed the deer would be considered "open and unclaimed land" within the meaning of that phrase in Article III of the Treaty such that defendant may assert his treaty rights as a defense.

## II.   INTERPRETATION OF INDIAN TREATIES[3]

Before we turn to the text of the Treaty at issue in this case, we explain how we are to interpret its text, bearing in mind that interpretation of Indian treaties is a matter of federal law, not state law. *See* Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 2.01(1), 109 (Nell Jessup Newton ed 2012) (explaining that federal law governs United States' recognition of tribal status and rights).

---

[2] The state, in its briefing, raised several additional facts that were elicited during trial. Because those additional facts were elicited during trial—that is, *after* the trial court ruled on the state's motion *in limine*—we do not address those facts here.

[3] Throughout this opinion, we use the term "Indian," rather than some alternative term, because that is the term used in the relevant case law, federal legislation, and scholarly literature.

Treaty interpretation "is a form of contract interpretation." *State v. Watters*, 211 Or App 628, 641, 156 P3d 145, *rev den*, 343 Or 186 (2007). To interpret a contract, "we first examine the text and context," followed next by "extrinsic evidence of the circumstances underlying [its] formation" to "determine if the contract provision is ambiguous." *Id.* (citation and internal quotation marks omitted). "If the provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction to determine the provision's meaning." *Id.* (citation and internal quotation marks omitted).

Although interpreting an Indian treaty is similar to interpreting a private contract, there are several important differences: "[T]reaties are construed more liberally than private agreements," and "to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. U.S.*, 318 US 423, 431-32, 63 S Ct 672, 87 L Ed 877 (1943). Additionally, "the standard principles of statutory construction do not have their usual force in cases involving Indian law"; instead, the United States Supreme Court has developed specific "canons of construction applicable in Indian law." *Montana v. Blackfeet Tribe of Indians*, 471 US 759, 766, 105 S Ct 2399, 85 L Ed 2d 753 (1985). First, "[i]t is well established that, in construing a treaty between the United States and Indians, the courts will construe it liberally in favor of the Indians." *Seufert Bros. v. Hoptowit et al.*, 193 Or 317, 322, 237 P2d 949, *cert den*, 343 US 926 (1952) (collecting cases). Second, an Indian treaty is construed "in the sense in which its provisions would naturally be understood by the Indians." *Id.* And third, "ambiguities should be construed in favor of the Native Americans." *Watters*, 211 Or App at 641.[4]

The United States Supreme Court has explained the reasons for adhering to those special canons of construction:

---

[4] *See also* Cohen, *Cohen's Handbook of Federal Indian Law* § 2.02(1) at 113-14 (noting that the "basic Indian law canons of construction require that treaties *** be [1] liberally construed in favor of the Indians"; that "[2] all ambiguities are to be resolved in their favor"; and that "[3] treaties and agreements are to be construed as the Indians would have understood them").

> "In construing any treaty between the United States and an Indian tribe, it must always \*\*\* be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand \*\*\* ha[d] no written language and [we]re wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States[.]"

*Jones v. Meehan*, 175 US 1, 10-11, 20 S Ct 1, 44 L Ed 49 (1899).

The Court's interpretive rules not only reflect a perceived inequality in bargaining power and the likelihood of miscommunication between the Indians and the representatives of the United States who negotiated the Indian treaties, but those rules also reflect the Court's understanding that a "treaty was not a grant of rights *to* the Indians, but a grant of right *from* them—a *reservation* of those not granted." *United States v. Winans*, 198 US 371, 381, 25 S Ct 662, 49 L Ed 1089 (1905) (emphases added). In other words, "all powers of tribes, as sovereign nations, were retained unless granted by the tribe pursuant to treaty." Charles F. Wilkinson & John M. Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"—How Long a Time Is That?*, 63 Cal L Rev 601, 619 (1975) (noting that "This reserved rights doctrine has been described as perhaps the most basic principle of all Indian law").[5]

---

[5] The Indians' reserved rights to fish, hunt, and use open and unclaimed land operate as a sort of servitude or profit upon that land. *See Winans*, 198 US at 381 ("[T]he treaty \*\*\* imposed a servitude upon every piece of land as though described therein."); *see also* Cohen, *Cohen's Handbook of Federal Indian Law* § 18.04(2)(f) at 1174 ("Off-reservation hunting, fishing, and gathering rights are servitudes over the burdened lands. Neither states nor private property owners may bar tribal access to areas subject to treaty hunting, fishing, and gathering rights."); Whitney Angell Leonard, *Habitat and Harvest: The Modern Scope of Tribal Treaty Rights to Hunt and Fish*, 3 Am Indian LJ 285, 294 (2014) ("[T]reaty provisions guaranteeing tribes the right to hunt, fish, and gather off-reservation in perpetuity reserved to those tribes a property interest in their continued right

With that interpretive framework in mind, we turn to the treaty provision at the center of the parties' dispute in this case.

## III.   INTERPRETATION OF THE YAKAMA TREATY

To interpret the Treaty, we begin by examining its text and context, followed by the circumstances of the Treaty's negotiation, information regarding the Yakamas' cultural understanding of land occupancy, and lastly, application of the appropriate maxim of construction—*i.e.*, that ambiguities should be construed in favor of members of the Yakama Nation.

### A.   *The Text and Context of the Treaty*

Defendant in this case contends that he took the deer under the hunting rights reserved in Article III of the Treaty, which provides, in relevant part:

> "The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; *together with the privilege of hunting*, gathering roots and berries, and pasturing their horses and cattle *upon open and unclaimed land*."

1855 Treaty with the Yakama, Art III, 12 Stat 951 (emphases added). As evidenced, that provision reserves the right of the Yakama people to hunt on "open and unclaimed land." The Treaty does not, however, define the terms "open" and "unclaimed."

This court previously interpreted the phrase "open and unclaimed land" in *Watters*. 211 Or App 639-47. In *Watters*, the defendants killed an elk on privately owned timber land and argued that the land was "open and unclaimed" within the meaning of the 1855 Nez Perce

---

to carry out these activities. This right has been most aptly described as a profit à prendre, the property law right to enter another person or entity's property and remove or extract a resource.").

Treaty. *Id.* at 639.[6] We noted that the land in question "was gated, included cabins, was posted with signs at major points of entrance, had cattle guards, had roads, and had drift fences." *Id.* at 640. We ultimately held that "privately owned land that shows signs of habitation (such as cabins), that includes signs announcing its ownership, and that has other indicia of ownership (such as cattle guards and gated roads) is not open and unclaimed." *Id.* at 647.

We did not, however, address whether privately owned land that *lacks* such indicia of ownership is considered "open and unclaimed." *See id.* at 639-40.

In resolving the issue in *Watters*, we explained that

"At the time of the 1855 treaty, the word 'open,' as relevant here, meant, 'Not fenced or obstructed; as an open road. \*\*\* Admitting all persons without restraint; free to all comers.' II Noah Webster, *An American Dictionary of the English Language* (1828) (italics in original). To 'claim' meant, 'To have a right or title to; as, the heir claims the estate by descent; he claims a promise.' I Noah Webster, *An American Dictionary of the English Language* (1828) (italics in original); *see also* I John Bouvier, *Law Dictionary* 278 (1874) (A 'claim' is the 'possession of a settler upon the wild lands of the government of the United States \*\*\*.')."

*Id.* at 642. Based on those dictionary definitions, we said that "Those definitions suggest that, to those involved in negotiating and signing the 1855 treaty, open and unclaimed lands were those that were not fenced or obstructed (open) and to which no settler had title or possession (unclaimed)." *Id.*

Those dictionary definitions—although suggestive of the meaning of "open and unclaimed" as used in the Treaty—are not conclusive of that meaning: "Dictionaries, after all, do not tell us what words mean, only what words

---

[6]  In 1854 and 1855, Washington Territorial Governor Isaac Stevens executed nine treaties with 23 tribes and bands of the Pacific Northwest. Those treaties are collectively referred to as the "Stevens Treaties," and the text of those treaties is "identical in all essential elements." Vincent Mulier, *Recognizing the Full Scope of the Right to Take Fish under the Stevens Treaties: The History of Fishing Rights Litigation in the Pacific Northwest*, 31 Am Indian L Rev 41, 41 & n 1 (2006). Both the Treaty at issue in this case and the Nez Perce treaty at issue in *Watters* were "Stevens Treaties."

*can* mean[.]" *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) (emphasis in original). And, perhaps more importantly, the words used in a treaty with the Indians must "be construed, *not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.'"* *Jones*, 175 US at 11 (emphasis added).

In discerning how the Yakama negotiators would have understood the treaty words used to express their reserved hunting rights, it is essential to note that they faced a significant linguistic disadvantage throughout the treaty negotiations. As the United States Supreme Court recently acknowledged with regard to the Treaty,

> "The parties negotiated the treaty in Chinook jargon, a trading language of about 300 words that no Tribe used as a primary language. The parties memorialized the treaty in English, a language that the Yakamas could neither read nor write. And many of the representations that the United States made about the treaty had no adequate translation in the Yakamas' own language."

*Wash. State Dept. of Licensing v. Cougar Den, Inc.*, 586 US ___, ___, 139 S Ct 1000, 1012, 203 L Ed 2d 301 (2019); *see also United States v. Washington*, 384 F Supp 312, 330, *aff'd*, 520 F2d 676 (1975) ("Having only about three hundred words in its vocabulary, the [Chinook] Jargon was capable of conveying only rudimentary concepts, but not the sophisticated or implied meaning of treaty provisions about which highly learned jurists and scholars differ."); Charles F. Wilkinson, *Messages from Frank's Landing: A Story of Salmon, Treaties, and the Indian Way* 11 (2006) ("Like pidgin English, the Chinook jargon was a rudimentary device for trade, a patchwork of English, French, and various tribal languages. How could it possibly speak to sovereignty, land ownership, fishing rights, assimilation, freedom, or the futures of societies?"). Thus, the negotiations took place in a language not well-suited to precisely communicating the legal effect of the Treaty's provisions regarding reserved hunting rights.

The limitations of Chinook jargon as a negotiating language are evident in this case. In Chinook jargon, the word "open" is translated as "háhlakl," meaning "[w]ide; open," as

in "open the door" or a place where the woods "become less dense." George Gibbs, *Dictionary of the Chinook Jargon, or, Trade Language of Oregon* 4, 39 (1863). Meanwhile, there is no word in Chinook jargon corresponding to "unclaimed," or "claim," or any other variation thereof. *See id.* at 34-35. As defendant notes, perhaps the closest analog for describing "claimed" land would have been to describe land that is fenced, because Chinook jargon includes a word describing a "fence" or "corral" (*i.e.*, "kul-lagh"). *See id.* at 11, 35. Additionally, Chinook jargon lacks any words equivalent to "own," "owned," "title," "property," "possess," or "settlement." *See id.* at 38-41.

Given the words used in the Treaty to describe the Indians' reserved hunting rights, we maintain—consistent with what we said in *Watters*—that the Indian negotiators would have understood that their reserved hunting rights extended to lands that are not fenced and not claimed by settlers. However, given the significant language barriers facing the Yakama negotiators and the lack of any adequate translation for the English words "open" and "unclaimed," we think it highly doubtful that the Yakama would have understood that their reserved hunting rights *did not* extend to unfenced lands that bore no outward indication of occupation but were nevertheless "claimed" in the purely legal sense familiar to the United States negotiators who drafted the Treaty. Instead, the minutes of the treaty negotiations—to which we turn next—show that the United States negotiators repeatedly explained to the Yakama that their reserved hunting rights would extend to lands not "occupied" by settlers.

B.   *1855 Yakama Treaty Negotiations*

The negotiations leading up to the Treaty "took place over two weeks and are memorialized in minutes." *Watters*, 211 Or App at 643. Those minutes reveal that "Indian leaders negotiated carefully about their rights to hunt, fish, and gather on and off the newly designed reservations." Clifford E. Trafzer, *The Legacy of the Walla Walla Council, 1855*, 106 Or Hist Q, no 3, at 398, 403-04 (2005). The negotiators for the United States—Governor Isaac Stevens and General Joel Palmer—repeatedly explained that under the

Treaty provisions, the Indians would retain the right to use off-reservation lands not "occupied" by white settlers:

> "You will be allowed to go to the usual fishing places and fish in common with the whites, and to get roots and berries and to kill game on land not *occupied* by the whites; all this outside the Reservation.

> "* * * * *

> "[You] shall have the same liberties outside the Reservation *** on land not *occupied* by whites, to kill game, to get berries and to go on the roads to market.

> "* * * * *

> "We have told these people and it is so said in the paper that their horses and cattle would be allowed to graze outside of the reservation the same as our people when it was not *occupied* by whites.

> "* * * * *

> "I will ask of Looking Glass whether he has been told *** that he can catch fish at any of the fishing stations, that he can kill game and can go to Buffalo when he pleases, that he can get roots and berries on any of the lands not *occupied* by settlers."

Oregon Bureau of Indian Affairs, *Certified Copy of the Original Minutes of the Official Proceedings at the Council in Walla Walla Valley, Which Culminated in the Stevens Treaty of 1855* (unpaginated) (1953) (emphases added), *available at* https://www.lib.uidaho.edu/mcbeth/governmentdoc/1855council.htm (last accessed June 22, 2021).

In light of those statements by Stevens and Palmer during negotiations, we think the Yakama would have understood that their reserved hunting rights extended to unfenced lands that were not occupied by settlers. Moreover, because we must interpret the Treaty's provisions in "the sense in which they would naturally be understood by the Indians," *Jones*, 175 US at 11, we think the Yakama negotiators would have understood "occupied" to mean actual physical occupation by settlers—an understanding that is consistent with the Indian negotiators' cultural understanding of land occupancy, to which we now turn.

## C.   *The Yakamas' Understanding of Land Occupancy*

Interpreting treaties between the United States and Indians "present[s] an especially difficult challenge" due to the cultural differences between those groups:

> "A great and unbridgeable void existed between the language and culture of the two races. * * * Accordingly, tribes likely understood various treaty provisions very differently from how Anglo-Americans might have construed them. * * * Because Indian treaties were the products of agreement between two very different civilizations, interpreters of the documents must navigate the unique cultural divide[.]"

Jacob Schuman, *Indian Canon Originalism*, 126 Harv L Rev 1100, 1108-09 (2013) (internal quotation marks omitted). In navigating that cultural divide, we are cognizant that the Yakama attending the 1855 treaty negotiations were probably unfamiliar with Western legal concepts and terminology relating to property ownership, and that those are not the concepts and terms by which they would have understood their reserved hunting rights under the Treaty. Justice Jackson remarked upon the Indians' lack of familiarity with Western property concepts in *Northwestern Bands of Shoshone Indians v. United States*:

> "We doubt if any interpreter could intelligently translate the contents of a writing that deals with the property concept, for the Indians did not have * * * words to fit ideas that have never occurred to them. Ownership meant no more to them than to roam the land as a great common, and to possess and enjoy it in the same way that they possessed and enjoyed sunlight and the west wind and the feel of spring in the air. Acquisitiveness, which develops a law of real property, is an accomplishment only of the 'civilized.'"

324 US 335, 357, 65 S Ct 690, 701, 89 L Ed 985 (1945) (Jackson, J., concurring).[7]

---

[7] In *State v. Cutler*, 109 Idaho 448, 459, 708 P2d 853 (1985), the dissenting justices acknowledged the cultural differences between Western and Indian concepts of property in a rather forceful rebuke of the majority's interpretation of a treaty provision:

> "[I]t is unreasonable to circumstantially infer that the Indians * * * understood Anglo-Saxon concepts of land occupancy solely on the basis of some visits by tribal leaders to white settlements. Such a conclusion, without more

Given the Yakamas' probable lack of familiarity with Western property concepts, we do not believe they would have understood "occupation" of land in terms of holding legal title. Rather, the Yakama and their neighbors more likely understood "occupation" to mean actual physical occupation or use of the land. Indeed, as one scholar has noted,

> "Pacific Northwest Indians probably had no direct cultural analogue to the real property notion of title. The opinions of anthropologists vary as to whether particular tribes claimed distinct areas of land as against other tribes, but there is evidence that at least some tribes had strong notions of territory. Nevertheless, *it may generally be said that these territories were defined primarily through physical occupation rather than ownership.*

> "When the Indians' probable lack of understanding of the notion of paper title is coupled with their unfamiliarity with the English language, it raises doubts as to whether Indians understood that land could be 'occupied' in the absence of actual physical presence.

> "* * * * *

> "Because Indians were probably unfamiliar with the property concept of title, their perceptions of 'open and unclaimed' or 'unoccupied' were likely based on actual physical occupation."

Bradley I. Nye, *Where Do the Buffalo Roam? Determining the Scope of American Indian Off-Reservation Hunting Rights in the Pacific Northwest*, 67 Wash L Rev 175, 189, 192-93 (1992) (emphasis added); *see also* R. Douglas Hurt, *American Agriculture: A Brief History* 30 (rev 2002) ("[T]he Indians did not recognize individual rights to land other than the right of use or occupancy[.]").

In light of that cultural backdrop, the Yakama would not have understood lands to be "occupied" based on the foreign concept of paper title; instead, "outward signs of settlement or physical occupation such as houses, fences, and outbuildings would indicate" to the Yakama whether

_____

corroborative evidence, is grossly ethnocentric, for it fails to take into account the fact that the Indians' concepts of property, possession, and occupancy were different from the white man's."

the land was "occupied" within the meaning of the Treaty. Nye, 67 Wash L Rev at 193.

It bears noting that, because those physical indications are the *sine qua non* of "occupation" for treaty purposes, the actual ownership of the land—federal, state, or private—is not part of the determination of whether that land is "open and unclaimed" within the meaning of the Treaty. *See* Cohen, *Cohen's Handbook of Federal Indian Law* § 18.04(2)(f) at 1174 ("Neither states nor private property owners may bar tribal access to areas subject to treaty hunting, fishing, and gathering rights." (Citing *Winans*, 198 US at 384 (holding that under the 1855 Yakima Treaty, Indians had an easement to go across and use privately owned land pursuant to their treaty fishing rights).)).[8]

In short, owing to the Yakamas' traditional understanding of "occupied" lands—in addition to their probable lack of familiarity with Western concepts of property law—we think the Yakama negotiators would have understood "occupied" lands to mean lands that bore some indication of actual physical occupation or use—*e.g.*, fences, houses, or outbuildings.

D.   *The Yakamas' Understanding of "Open and Unclaimed Land"*

To sum up, we have construed Article III of the Yakama Treaty according to the canons prescribed by the United States Supreme Court, and in so doing, we are

---

[8] We note that the appellate courts in Idaho and Montana have determined that privately owned land is categorically not "open and unclaimed" for purposes of treaty reserved hunting rights. *See, e.g.*, *State v. Arthur*, 74 Idaho 251, 261, 261 P2d 135, *cert den*, 347 US 937 (1954) ("[T]he meaning of 'open and unclaimed land,' as employed in the treaty *** was intended to include and embrace such lands as were not *** appropriated to private ownership."); *State v. Stasso*, 172 Mont 242, 248, 563 P2d 562 (1977) ("Land owned or occupied by private parties is in no way open and unclaimed within the contemplation of this treaty.").

However, we also note that the Washington State Supreme Court has affirmed a jury instruction that defined "open and unclaimed land" as requiring "outward indications of such ownership observable to a reasonable man." *State v. Chambers*, 81 Wash 2d 929, 936, 506 P2d 311, *cert den*, 414 US 1023 (1973). Moreover, the issue of whether private property is categorically not "open and unclaimed" under the Treaty has not been addressed by the United States Supreme Court or the Oregon Supreme Court—the only two courts whose decisions would bind this court.

persuaded—by the Treaty's words, the circumstances surrounding the Treaty negotiations, and the Yakamas' cultural understanding of property occupancy—that the Yakama negotiators would have understood that their reserved right to hunt on "open and unclaimed lands" extended to lands that bear no indication of actual physical occupation, such as fences, houses, or outbuildings.[9]

With that interpretation in mind, we turn next to its application to the facts of this case.

## IV.  APPLICATION

As noted above, in resolving the issues raised by defendant on appeal, we must "determine whether defendant presented any evidence to support the defenses he sought to assert and evaluate that evidence in the light most favorable to defendant." *Shields*, 289 Or App at 46 (citation and internal quotation marks omitted). Put differently, we will uphold the trial court's decision to withhold defendant's treaty defense from the jury "only if there is no evidence in the record to support one or more elements of the defense." *Id.* at 47. Because the state contended in its motion *in limine* that, as a matter of law, defendant was not entitled to present his treaty defense, we briefly address whether the state is correct in that contention before we turn to examining whether there is any evidence to support the treaty defense that defendant sought to assert.

As previously noted, the state argues that defendant was not entitled to present his treaty defense, because the parcel where defendant took the deer was not "open and unclaimed" as it "had indications of private ownership"—specifically,

> (1) "The [parcel] had been in private ownership by [the landowner's] family since the 1880s"; (2) "The land immediately surrounding the parcel was cultivated"; (3) "A county road

---

[9] We note that we would be compelled to reach that same conclusion even assuming, arguendo, that the meaning of the phrase "open and unclaimed land" was ambiguous. *See Watters*, 211 Or App at 641 ("[A]mbiguities should be construed in favor of the Native Americans."); *Antoine v. Washington*, 420 US 194, 199-200, 95 S Ct 944, 43 L Ed 2d 129 (1975) (treaty must be interpreted by liberally construing any ambiguities in the text in favor of the tribe); *Blackfeet Tribe of Indians*, 471 US at 766 (canon of construction applicable in Indian law requires liberal construction, with ambiguous provisions interpreted to the Indians' benefit).

ran through the property"; (4) "The land across the road from the parcel was fenced, as was land on the downhill side of [the] parcel"; and (5) "There was a farm structure within view of the parcel."

That evidence, however, is insufficient to require a determination, as a matter of law, that the parcel had indications of actual physical occupation such that defendant was not entitled to present his defense to the jury.

For one, the fact that the parcel had been privately owned since the 1880s is not, itself, an indication of actual physical occupation of the parcel—that is precisely the sort of "paper title" that we have said would have been unfamiliar to the Yakama negotiators in 1855. Moreover, as we said above, because physical indications are the *sine qua non* of "occupation" for treaty purposes, the actual ownership of the parcel is not part of the determination of whether that land is "open and unclaimed" for purposes of defendant's reserved hunting rights.

Next, evidence that lands *around* the parcel had been cultivated does not establish as a matter of law that the parcel *itself* was under actual physical occupation or use; rather, that evidence could be an indication only that those surrounding lands were perhaps not "open and unclaimed." Likewise, that a county road passes beside the uphill boundary of the parcel does not establish that the parcel itself bore indications of actual physical occupation signifying that it was not "open and unclaimed."

Similarly, evidence that "land across the road from the parcel was fenced," and that "land on the downhill side of [the] parcel" was fenced does not establish as a matter of law that the parcel was not "open and unclaimed." If anything, evidence that other, nearby pastures had been fenced—in contradistinction to the unfenced parcel—would likely indicate that the fenced areas were actually physically occupied areas, whereas the unfenced areas were not.

Lastly, recalling Vanderwerf's testimony that he could see "a silo or something" in "the far, far distance," the fact that a farm structure was visible from the parcel does not establish that the parcel itself was therefore no

longer "open and unclaimed" land within the meaning of the Treaty.

In short, we are not persuaded that any of the evidence proffered by the state would have required a determination, as a matter of law, that the parcel where defendant killed the deer bore indications of actual physical occupation and could not, therefore, be "open and unclaimed land."

Furthermore, viewed in the light most favorable to defendant, much of the testimony elicited at the hearing on the state's motion *in limine* provides sufficient evidence to raise the defense that the parcel was "open and unclaimed land" within the meaning of the Treaty: The parcel was "just an open field" with grass "stubble" and sagebrush; it was not planted or cultivated; it had no fences on it or enclosing it; there were no signs present indicating its ownership; there were no vehicles parked on it; and there were no houses or other buildings on it. In other words, the parcel bore no indications of actual physical occupation.

Consequently, we conclude that there was sufficient evidence in the record to support defendant's treaty defense that the parcel where he killed the deer would have been considered "open and unclaimed land" within the meaning of Article III of the 1855 Yakama Treaty.

As such, defendant was entitled to raise his treaty defense at trial; therefore, the trial court erred when it granted the state's motion *in limine* to prohibit defendant from doing so. Accordingly, we reverse defendant's conviction, and we remand for a new trial.

Reversed and remanded.